**In re DIGITAL ISLAND SECURITIES LITIGATION**

**Civil Action No. 02–57–GMS.**

United States District Court,
D. Delaware.

Sept. 10, 2002.

Pamela S. Tikellis and Robert J. Kriner, Jr. of Chimicles & Tikellis LLP, Wilmington, DE, Jeffery G. Smith and Robert Abrams of Wolf Haldenstein Adler Freeman & Herz LLP, New York City, of counsel, for plaintiffs.

Robert K. Payson, Philip A. Rovner, and Kevin R. Shannon of Potter Anderson & Corroon LLP, Wilmington, DE, Mark D. Wegener, Edward B. Schwartz and Martin F. Cunniff of Howrey Simon Arnold & White, LLP, Washington, DC, of counsel, for defendants.

### *MEMORANDUM OPINION*

SLEET, District Judge.

## I. INTRODUCTION

This securities class action suit arises from Cable & Wireless plc's acquisition of Digital Island, Inc. Individual plaintiffs filed complaints on January 22, 2002, January 31, 2002, and February 22, 2002. The plaintiffs filed a joint motion for consolidation, appointment of lead plaintiff, and appointment of lead counsel on March 25, 2002. The court granted that motion on April 16, 2002. On May 15, 2002, the plaintiffs filed their Consolidated Amended Class Action Complaint. In this complaint, the plaintiffs contend that the defendants defrauded the Digital Island

shareholders into approving the sale of the company to Cable & Wireless for less than fair value.[1]

Presently before the court is the defendants' motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 (the "PSLRA"). For the following reasons, the court will grant this motion.

## II. BACKGROUND

### A. The Tender Offer

Before it was acquired and merged into Cable & Wireless, Digital Island provided various e-Business services used for online marketing and sales, customer service, fulfillment, software, document, and multimedia distribution. Digital Island provided these services through a managed Internet infrastructure that integrated content delivery, hosting, intelligent networking, and applications services.

Ernst was the CEO, President, and a director of Digital Island at all relevant times. Bass, Cotsakos, Cirillo–Goldberg, Jones, Marbut, and Soghikian were directors of Digital Island as of May 14, 2001. Wallace, Reed, McTighe, Drolet, Duff, and Lefar became directors of Digital Island on July 16, 2001 when Cotsakos, Cirillo–Goldberg, and Marbut resigned from the Board of Directors (the "Board").

In 2000 and 2001, Digital Island lost a large amount of its market capitalization, falling from a high of $150 per share in December 1999 to a low of $1.50 in the spring of 2001. Because of its own financial problems related to the economic conditions at that time, Digital Island and its financial advisor Credit Suisse First Boston ("CSFB") began to contact potential acquirers, including Cable & Wireless. However, Digital Island stated in its Form 10Q for the quarter ended March 31, 2001 that "the deteriorating market conditions stalled most discussions in the preliminary stages." Nevertheless, Cable & Wireless made an initial offer to purchase Digital Island's stock for $2.25 per share. After considering the offer and meeting with its financial advisors, Digital Island advised Cable & Wireless that it was prepared to begin negotiations, provided that the offer price was increased to at least $3.25.

On May 10, 2001, Digital Island issued a press release announcing its prior agreement to provide certain services to Microsoft Corporation. The price of the stock rose that day from $2.00 per share to $3.69 per share. The stock dropped to $3.13 at the close of trading the following day.

On May 11, 2001, Cable & Wireless representatives indicated that the company was prepared to offer $3.40 per share for the stock.[2] Digital Island made a counteroffer of $4.10 per share. Cable & Wireless subsequently advised that its offering price remained at $3.40.

On May 13, 2001, the Digital Island seven-member Board met to evaluate the company's strategic options, including the

---

1. The defendants are Ruann F. Ernst ("Ernst"), Charlie Bass ("Bass"), Christos Cotsakos ("Cotsakos"), Mary Cirillo–Goldberg ("Cirillo–Goldberg"), G. Bradford Jones ("Jones"), Robert Marbut ("Marbut"), Shahan Soghikian ("Soghikian") (collectively, the "original directors"), Graham Wallace ("Wallace"), Don Reed ("Reed"), Mike McTighe ("McTighe"), Robert Drolet ("Drolet"), Avery Duff ("Duff"), Marc Lefar ("Lefar") (collectively, the "new directors" and collectively with the "original directors", the "individual defendants"), Digital Island, Inc. ("Digital Island"), Dali Acquisition Corp. ("Dali"), and Cable & Wireless plc ("Cable & Wireless").

2. The plaintiffs note that it was also around this date when "certain key employees of Digital Island met with a representative of C & W to discuss employment and retention contracts."

pending Cable & Wireless offer. In particular, the Board, together with the executive management and representatives of CSFB, examined whether the company could stay independent "in an industry environment marked by waning and uncertain economic conditions which has made it difficult to raise the necessary capital [it] need[ed]." The Board's review also included an assessment of "the scarcity of potential suitors, suitable strategic partners and financial investors" and "the likelihood of consummation of such comparable and alternative transactions...."

With regard to the Cable & Wireless offer, CSFB informed Digital Island that it was of the opinion that the $3.40 offer was "fair from a financial point of view to our stockholders." The Board considered the fact that the $3.40 offer price represented an 8% premium over the closing price of the stock that day. It also represented a 51% premium over the average trading price of $2.25 for the immediately preceding twenty trading days, and a 68.5% premium over the immediately preceding thirty trading days. It also represented a 4.6% premium over the $3.25 per share price that Digital Island had indicated it would accept just weeks before.

Finally, the Board considered several other factors, including the fact that "Cable & Wireless was in a strong strategic position ... and would likely be willing to pay more for our company than any other suitor." Based upon these, and other, considerations, the Board voted unanimously to approve the execution of the Merger Agreement and related documents, and to recommend to the shareholders that they accept the offer. Under the Offer to Purchase (the "Offer"), those Digital Island shareholders who tendered their shares by midnight on June 18, 2001 would receive $3.40 per share. For those who did not tender, their shares would be canceled following the merger and also exchanged for $3.40 per share. Furthermore, under the Offer, no appraisal rights were available in connection with the Offer. The Offer did indicate, however, that shareholders might have appraisal rights in connection with the merger.

The Offer further provided for the possibility of a subsequent offering period during which Digital Island shareholders who had not tendered their shares during the initial offering period could do so at that time. Those shareholders who had tendered their shares during the initial offering period would have been allowed to withdraw their tenders during the initial offering period. They would, however, not be able to withdraw their tenders during the subsequent offering period. The first tender offer was completed on June 19, 2001, with the purchase of approximately 80% of Digital Island's total issued and outstanding common stock.

## B. The Bloomberg and MLB Deals

Despite the serious financial issues that it was facing, Digital Island had been very successful in developing an impressive roster of customers. Indeed, as of May 31, 2001, Digital Island had contracts with 881 customers, including America Online, Charles Schwab, CNBC.com, E*TRADE, Hewlett–Packard, JP Morgan Chase, Microsoft, Reuters, Sony, and Universal Music Group. On June 20, 2001, Digital Island announced an agreement to provide certain services to a new customer, Bloomberg, L.P. ("Bloomberg"). The plaintiffs contend that this agreement had not previously been disclosed either in Digital Island's 14D–9, or in Cable & Wireless' Offer. On July 2, 2001, Digital Island further announced an agreement with Major League Baseball Advanced Media, L.P. ("MLB") to provide certain services. The plaintiffs contend that this agreement had also not been previously disclosed in

Digital Island's 14D–9, in Cable & Wireless' Offer, or in any other publication.

The plaintiffs also contend that, since these two deals were announced only after the June 18 date on which the tender offer terminated, Digital Island shareholders who tendered their shares could not withdraw their tenders. Moreover, the plaintiffs argue that, even without such a prohibition, there would be no incentive for any individual shareholder to withdraw, because once Cable & Wireless announced on June 18, 2001 that it had acquired 80% of Digital Island stock, there could be no certainty that a sufficient number of other shareholders would also withdraw their tenders to preclude Digital Island's takeover at the $3.40 price.

### C. Executive Compensation and Retention

The "executive compensation" packages and other compensation to be paid by Cable & Wireless after the acquisition are summarized in Digital Island's Schedule 14D–9. With the exception of Ernst, each of the individual defendants held stock options pursuant to the Digital Island Stock Incentive Plans instituted in 1999 and 2000. As a result of the tender offer and merger, each was paid the face value of the options, *i.e.*, the difference, if any, between option price and $3.40. For these defendants, the compensation ranged from $19,000 to $57,000 in connection with the payment for their in-the-money options, whether vested or unvested. The plaintiffs contend that no other shareholders received such extra consideration for their stock. The defendants maintain, however, that all executive compensation and retention issues were fully negotiated before the commencement of the tender offer.

Finally, the plaintiffs contend that five of the Digital Island officers, including Ernst, received lucrative employment contracts in connection with the merger. These contracts entitled them to generous salary and options packages as described in Cable & Wireless' Offer and Digital Island's SEC Form 14D–9. The plaintiffs thus claim that these agreements constituted extra compensation for the Digital Island common stock held by Digital Island officers. Moreover, the plaintiffs argue that the employment agreements were integral to the Merger Agreement because, if the merger were not consummated, those employment agreements would be void.

### D. The Merger

On August 3, 2001, Digital Island filed the Schedule 14A Proxy Statement in connection with a special meeting of shareholders to vote on the second-step merger. The Proxy Statement requested shareholder action on the merger and a decision of shareholders whether to seek appraisal under Delaware law. The Proxy Statement did not include information regarding the Bloomberg and MLB deals. The merger closed on or about August 30, 2001.

### III. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted when, accepting all well-pleaded factual allegations as true, the plaintiff is not entitled to relief as a matter of law. *See In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997). While the court must accept the factual allegations in the complaint as true, it "need not credit a complaint's 'bald assertions' or 'legal conclusions.' " *Id.* at 1429 (citation omitted). Therefore, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.1996).

The PSLRA raised Federal Rule of Civil Procedure 9(b)'s pleading requirements in securities fraud actions precisely to discourage frivolous, speculative lawsuits. *See Oran v. Stafford,* 226 F.3d 275, 288 (3d Cir.2000) (noting that "[b]oth the PSLRA and Federal Rule of Civil Procedure 9(b) impose heightened pleading requirements on plaintiffs who allege securities fraud."); *In re Advanta Corp. Securities Litig.,* 180 F.3d 525, 531 (3d Cir.1999) (stating that the "purpose of the [PSLRA] was to restrict abuses in securities class-action litigation."). In particular, the PSLRA changed the pleading requirements in private securities fraud litigation by requiring that a complaint plead both falsity and scienter with particularity. *See Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1034 n. 12 (9th Cir.2002).

Moreover, claims alleging material omissions of fact should be dismissed if they fail to "specify each statement alleged to have been misleading [due to any material omission], [and] the reason or reasons why the statement is misleading. . . ." 15 U.S.C. § 78u–4(b)(1). In other words, a claim for securities fraud must set forth the "who, what, when, where, and how: the first paragraph of any newspaper story." *Advanta,* 180 F.3d at 534 (citation omitted); *accord Schiller v. Physicians Res. Group, Inc.,* 2002 WL 318441, at *16 (N.D.Tex. Feb.26, 2002) (stating that, the PSLRA "does not permit the [c]ourt to look at the broad picture to determine if [the][p]laintiff has properly plead its claim") (citation omitted). Thus, since Congress enacted the PLSRA in 1995, corporations can no longer be so easily "held hostage to abusive and frivolous shareholder suits." *Winn v. Symons Int'l Group, Inc.,* 2002 WL 826356, at *2 (S.D.Ind. May 1, 2002).

## IV. DISCUSSION

The plaintiffs assert claims for relief under the following four statutory provisions: (1) Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e); (2) Section 14(d)(7) of the Williams Act, 15 U.S.C. § 78n(d)(7); (3) Section 14(a) of the Williams Act, 15 U.S.C. § 78n(a); and (4) Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t(a). The court will discuss each claim in turn.

### A. Section 14(e) of the Williams Act

Under Section 14(e) of the Williams Act, an individual or entity must disclose all material information during a tender offer, provided that the individual or entity has such a duty to do so. In the present case, the plaintiffs allege that "[by] failing to announce the Bloomberg and Major League Baseball deals prior to the expiration of the Offer to Purchase, Defendants [other than 'New Directors'] violated the Williams Act provision which requires disclosure of all material information in the context of a tender offer." Complaint ¶ 66, at 21. In response, the defendants argue that the plaintiffs have failed to allege a basis for establishing a breach by any defendant of a duty to disclose the deals in Schedule 14D–9, or any other filing. The defendants further contend that the plaintiffs have also failed to adequately allege scienter under the heightened pleading requirements of the PSLRA and Rule 9(b).

#### 1. The Duty to Disclose

■ It is axiomatic that "there is no securities fraud without a duty to disclose." *Blanchard v. Edgemark Fin. Corp.,* 2001 WL 587861, at *5 (N.D.Ill. Mar. 12, 2001). With regard to the defendants Cable & Wireless and Dali, it is clear that an acquiring company owes no duty to the target shareholders, absent a special relationship. *See Sheehan v. Little Switzerland, Inc.,* 136 F.Supp.2d 301, 310 (D.Del.2001) (holding that, "[t]he . . . defendants, as an acquiring company, owed

no duty to the ... shareholders or the plaintiffs...."); *Lerner v. FNB Rochester Corp.*, 841 F.Supp. 97, 103 (W.D.N.Y.1993) (acquiring corporation owes no duty of disclosure to target corporation's shareholders). Furthermore, in their responsive papers, the defendants offer no arguments to the contrary with regard to Cable & Wireless and Dali. In their responsive papers, however, the plaintiffs do allege that Cable & Wireless' CEO Wallace effectively became a Digital Island insider by virtue of his extended due diligence and negotiations with Digital Island. The court concludes that such an argument must fail for the simple reason that Wallace's involvement in the negotiations "lead[s] to an inference of hard bargaining on the part of [Wallace], in which [he] had every right to engage—not in the complicity in whatever breaches of duty [Digital Island's] board may have committed." *In re Wheelabrator Techs., Inc. Shareholders Litig.*, 1992 WL 212595, at *10 (Del.Ch. Sept.1, 1992). Accordingly, because Cable & Wireless, Dali, and Wallace had no duty to disclose the Bloomberg and MLB deals, Claim I is dismissed as to them.

■ The court further concludes that the plaintiffs have failed to identify any duty to disclose with regard to the remaining defendants. The Third Circuit has made clear that a duty to disclose "may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure." *Oran*, 226 F.3d at 285–286. A defendant "is not required to disclose a fact merely because a reasonable investor would like to know that fact." *In re CDnow, Inc. Sec. Litig.*, 138 F.Supp.2d

624, 633 (E.D.Pa.2001); *Glazer v. Formica Corp.*, 964 F.2d 149, 156–157 (2d Cir.1992).

The plaintiffs have not identified any Securities and Exchange Commission regulation or other legal authority that would impose a duty on the defendants to disclose the Bloomberg or MLB deals.[3] Indeed, the content of tender offers and solicitations related to tender offers are specifically set forth in 17 C.F.R. §§ 240.14d–100 and 240.14d–101. These schedules require the disclosure of certain specific categories of information defined by Regulation M–A, 17 C.F.R. §§ 229.1000, *et seq.* No portion of Regulation M–A, however, requires the disclosure of any agreements or transactions with customers, such as Digital Island's deals with Bloomberg and MLB.

The complaint further fails to identify a prior disclosure that was rendered "inaccurate, incomplete, or misleading" by the alleged omission. Nor does it state that any specific disclosures made by Digital Island or Cable & Wireless in connection with the tender offer were inaccurate, incomplete, or otherwise untruthful. Such an omission is fatal to the plaintiffs' complaint as it is incumbent on them to identify a specific statement that was rendered misleading by the alleged nondisclosure. *See e.g., Royal Bus. Group v. Realist, Inc.*, 933 F.2d 1056, 1065 (1st Cir.1991) (noting that the plaintiffs had "failed to point to any specific statements which, in light of the undisclosed information, were false when made."); *Blanchard*, 2001 WL 587861, at *5 (holding that the plaintiff had failed to demonstrate that alleged omissions rendered prior affirmative statements misleading).

3. The plaintiffs argue that the SEC filing regulations are only minimal disclosure requirements. Thus, they contend that any argument that the deals were not required by SEC regulation to be disclosed is untenable. While the court does not dispute that the SEC filing regulations may set forth only the minimal disclosure required, it is nevertheless relevant to determine whether the conduct in question did not arguably run afoul of the SEC's regulations.

In their responsive papers, the plaintiffs argue that the Schedule 14–9 cover page contains a statement that the Digital Island Board approved the Offer and Merger and recommended that the stockholders accept the offer and tender their shares. The plaintiffs argue that it is this statement which is false and misleading absent disclosure of the Bloomberg and MLB deals. However, this purportedly misleading statement is not mentioned in the complaint, and responsive papers are not the proper vehicles in which to make new allegations. *See e.g., Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 181 (3d Cir.1988). Accordingly, the court must disregard this allegation.

■ Moreover, even assuming that there were false or misleading statements, the plaintiffs nevertheless fail to attribute these statements to any individual defendants. Rather, they argue that the "group pleading" doctrine survived the passage of the PSLRA and is applicable to the present action.[4] The court must disagree that group pleading is permissible in this context.

Historically, under the group pleading doctrine, a company's statements or omissions "may be presumed to be the collective work of those individuals with direct involvement in the everyday business of the company." *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 902, n. 45 (S.D.Tex.2001). Although the Third Circuit has not addressed the applicability of group pleading under the PSLRA, numerous district courts within this Circuit have held that the PSLRA has effectively abolished the group pleading doctrine. *See P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.,* 142 F.Supp.2d 589, 620 (D.N.J. 2001) (concluding that the PSLRA abolished the group pleading doctrine); *Marra v. Tel–Save Holdings, Inc.,* 1999 WL 317103, at *5 (E.D.Pa. May 18, 1999); *In re Home Health Corp. of Am. Securities Litig.,* 1999 WL 79057, at *21 (E.D.Pa. Jan.29, 1999). In rejecting group pleading under the PSLRA, courts have reasoned that the requirement under the PSLRA that scienter be pled with particularity as to each defendant would be rendered meaningless should group pleading survive. *See P. Schoenfeld,* 142 F.Supp.2d at 620; *Marra,* 1999 WL 317103, at *5. Moreover, because the PSLRA allows the plaintiff to assert upon information and belief that a statement or omission is misleading, provided the complaint states with particularity all facts upon which this belief is formed, the plaintiff need not resort to group pleading. *See id.* The court finds this reasoning sound and persuasive, and will, therefore, adopt the approach of courts rejecting the viability of group pleading under the PSLRA. Accordingly, to the extent that Count I of the complaint relies on group pleading, it must be dismissed.

**2. Scienter**

■ Additionally, Count I must be dismissed for failing to plead scienter with

---

**4.** Alternatively, the plaintiffs allege that the Schedule 14D–9 cover page states that the board unanimously approved the sale. Thus, the plaintiffs contend that each member of the Digital Island Board is on record as having concluded that the shareholders should tender their shares, thus removing the situation from the "group pleading" doctrine. This, however, is exactly the type of situation that is construed as group pleading. *See In re Aetna Securities Litig.,* 34 F.Supp.2d 935, 948 (E.D.Pa.1999) (stating that, "[u]nder this doctrine, the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents, such as annual reports, prospectuses, registration statements, press releases, or other 'group published information' that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation ...").

the requisite specificity. Scienter is an element of a Section 14(e) claim. *See Clearfield Bank & Trust Co. v. Omega Fin. Corp.*, 65 F.Supp.2d 325, 342–343 (E.D.Pa.1999); *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 961 (2d Cir. 1987). The Third Circuit has defined scienter "as a mental state embracing intent to deceive, manipulate, or defraud." *In re Phillips Petroleum Securities Litig.*, 881 F.2d 1236, 1244 (3d Cir.1989) (citations omitted). The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To plead scienter under the PSLRA, the plaintiffs must allege facts "establishing a motive and an opportunity to commit fraud, or ... facts that constitute circumstantial evidence of either reckless or conscious behavior." *In re Advanta Corp. Securities Litig.*, 180 F.3d 525, 534–535 (3d Cir.1999). "When a complaint fails to plead scienter in conformity with the PSLRA, dismissal is required." *Mortensen v. AmeriCredit Corp.*, 123 F.Supp.2d 1018, 1023 (N.D.Tex.2000); *accord Advanta*, 180 F.3d at 531.

### a. Motive

The Third Circuit has cautioned that:

[p]ermitting blanket assertions of motive and opportunity to serve as a basis for liability under the Exchange Act would undermine the more rigorous pleading standard Congress has established. After the [PSLRA], catch-all allegations

that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.

*Advanta*, 180 F.3d at 535. Moreover, it is not enough to allege that the defendant was acting in his or her own economic self-interest. *See Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). To the contrary, courts assume that the defendant would act in his or her economic self-interest. *See id.; see also Abbell Credit Corp. v. Bank of Am. Corp.*, 2002 WL 335320, at *5 (N.D.Ill. Mar.01, 2002). Rather, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud" that would not be shared generally by corporate directors and officers. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

In the present case, the complaint alleges that the officers and directors wanted to "minimize the consideration paid by C & W" for the purpose of "secur[ing] lucrative employment contracts for certain Digital Island officers in the merged entity."[5] Complaint at ¶ 63. However, " '[a]lleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy Rule 9(b) and the PSLRA.' " *Tracinda Corp. v. Daimlerchrysler AG*, 197 F.Supp.2d 42, 84(D.Del.2002) (citation omitted). Here, the plaintiffs themselves

---

**5.** The plaintiffs raise for the first time in their responsive papers the argument that the Digital Island directors consented to a $3.40 purchase price because they were driven by a wish to trigger the vesting of their options. According to the plaintiffs, the directors thus feared that disclosure of the MLB and Bloomberg deals would cause Cable & Wireless to withdraw from the negotiations process because it would have refused to pay more than $3.40 per share. The plaintiffs also speculate that there were no other buyers willing to pay

more than $3.40 per share. Even assuming the court were to accept this allegation, it would nevertheless fail. On the one hand, this speculation leads to the conclusion that the Digital Island Board genuinely believed they were obtaining the highest possible price. On the other hand, if the Board had believed another buyer would pay more, their personal pecuniary motive would have been to announce the deals and sell the company for a higher price. Therefore, this argument fails to establish motive as well.

recognize that several directors resigned their positions as directors as a result of the acquisition. *See* Complaint at ¶ 23. Additionally, the plaintiffs' theory makes little economic sense because the directors' own stock options would have been devalued if they tried to sell the company for less than full price. *See Duncan v. Pencer*, 1996 WL 19043, at *10 (S.D.N.Y. Jan.18, 1996) (finding that the alleged motive was "economically irrational"). Thus, the complaint fails to allege any "concrete and personal benefits" realized by the outside director defendants. *Kalnit*, 264 F.3d at 139.

Finally, with regard to Ernst's employment offer with Cable & Wireless, it is "rather common" for an acquiring company to ask that the target company's officers remain employed with the merged entity or acquiring company. *See Golaine v. Edwards*, 1999 WL 1271882, at *4 (Del. Ch. Dec.21, 1999); *see also In re Criimi Mae, Inc. Securities Litig.*, 94 F.Supp.2d 652, 660 (D.Md.2000) (noting that "assertions that a corporate officer or director committed fraud in order to retain an executive position, or retain such a position with the merged company, simply do not, in themselves, adequately plead motive."). Furthermore, as discussed above, it is fundamental that "allegations [that] pertain to motivations common to every corporate merger ... cannot demonstrate scienter." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 623 (4th Cir.1999). The plaintiffs have thus failed to identify any cognizable motive that would support a Section 14(e) claim.

**b. Recklessness**

The plaintiffs have also failed to allege recklessness sufficiently to demonstrate scienter within the meaning of the PSLRA. The Third Circuit defines recklessness as an "extreme departure from the standards of ordinary care ... which presents a danger of misleading ... that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta*, 180 F.3d at 535 (internal quotations and citations omitted); *accord Schiller*, 2002 WL 318441, at *4 (stating that scienter under the PSLRA must be "severe recklessness which resembles a slightly lesser species of intentional misconduct") (citation omitted). Finally, "the definition of 'reckless behavior' should not be a liberal one lest any discernible distinction between 'scienter' and 'negligence' be obliterated." *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977).

In the present case, the plaintiffs contend that (1) because the defendants' positions allowed them access to inside information about Digital Island, they must have known about the MLB and Bloomberg deals; and (2) because the press releases of the deals were announced so soon after the tender offer concluded, the defendants' actions defrauded the Digital Island shareholders. Neither of these theories establishes a claim for recklessness.

Courts have long accepted that "knowledge of omitted facts does not itself establish scienter." *Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir.1987); *Advanta*, 180 F.3d at 539 (finding that "allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which courts, on numerous occasions, have determined to be inadequate'") (citations omitted). The plaintiffs' arguments that the timing of the press releases announcing the MLB and Bloomberg deals somehow establishes scienter has also been repeatedly rejected by courts. *See e.g., In re NAHC, Inc. Securities Litig.*, 2001 WL 1241007, at *20 (E.D.Pa. Oct.17, 2001) (rejecting the contention that the "short time

frame" between press release and alleged misstatements demonstrated recklessness); *Schiller*, 2002 WL 318441, at *14 (timing alone does not establish an inference of fraud); *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 68 F.Supp.2d 480, 488–489 (D.N.J.1999) (same). The plaintiffs have, therefore, failed to adequately plead scienter.

### B. Section 14(d)(7) of the Williams Act

■ The plaintiffs next assert that each of the defendants, except for the new directors, violated the "All Holders Rule" of the Williams Act.[6] The All Holders Rule requires that a bidder's tender offer be open to all security holders of the class of securities subject to the tender offer. *See* 17 C.F.R. § 240.14d–10(a). In order to demonstrate an All Holders Rule violation, a "[p]laintiff must allege and prove at a minimum four elements[:] (1) that the bidder, (2) during the pendency of the bidder's tender offer, (3) purchased a security that is the subject of the tender offer; (4) for more consideration than the bidder paid to other shareholders pursuant to the tender offer." *Walker v. Shield Acquisition Corp.*, 145 F.Supp.2d 1360, 1374 (N.D.Ga.2001); *Kahn v. Virginia Retirement Sys.*, 783 F.Supp. 266, 269 (E.D.Va. 1992), *aff'd* 13 F.3d 110 (4th Cir.1993). The defendants maintain that the complaint fails to allege a violation of the All Holders Rule because there is no allegation that any officer or directors received "extra" consideration for Digital Island shares "during the pendency of the bidder's tender offer." The court must agree.

As an initial matter, the court notes that Rule 14d–10, upon which Claim II is based, is applicable by its terms only to a bidder, and not to a selling shareholder. *See Priddy v. Edelman*, 679 F.Supp. 1425, 1431 (E.D.Mich.1988), *aff'd*, 883 F.2d 438

(6th Cir.1989); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 779 (2d Cir.1991) (affirming dismissal of Williams Act claim against target defendant). Nor do the plaintiffs argue otherwise in their responsive papers. As a result, because neither Digital Island, nor the individual defendants are bidders, Claim II will be dismissed as to them.

Additionally, the defendants argue that Claim II should be dismissed against each of them because the plaintiffs have not alleged that any purported extra consideration was given during the tender offer period. *See* 17 C.F.R. § 240.14d–10(a) (requiring that consideration paid to any security holder pursuant to the tender offer be the highest consideration paid to any other security holder during the tender offer.). Rule 14d–10(a)(2) is, on its face, "aimed at conduct during the pendency of the tender offer." *Walker*, 145 F.Supp.2d at 1375. Rule 14d–2(a) defines the commencement of an offer as "12:01 a.m. on the date when the bidder has first published, sent or given the means to tender to security holders." 17 C.F.R. § 240.14d–2(a). Applying this Rule, the tender offer at issue in the present case commenced on May 21, 2001 and ended on June 18, 2001.

The parties do not appear to dispute that the purported "extra consideration" provided to Digital Island executives took place before the tender offer period began. The focus thus becomes what interpretation the court should apply to the Rule 14d–10 language stating that the relevant time frame is "during such tender offer." The Third Circuit has not addressed this issue, and there is a split among other courts as to the interpretation of this phrase.

In affirming the district court's dismissal of a case under the All Holders Rule, the

---

6. Courts alternately refer to this Rule as the "Best Price Rule."

Seventh Circuit held that transactions or agreements made before the commencement of the tender offer, do not, by definition, occur "during the tender offer." *Lerro v. Quaker Oats Co.*, 84 F.3d 239, 243 (7th Cir.1996). In that case, the plaintiffs challenged certain benefits granted to a controlling shareholder in a Distribution Agreement executed prior to the commencement of the tender offer. Under the terms of that Distribution Agreement, the shareholder received certain exclusive distribution rights that would accrue upon successful consummation of the tender offer. The Seventh Circuit declined to find an All Holders Rule violation, explaining that:

> [b]efore the offer is not "during" the offer. Many cases ... tell us to respect the language of the securities statutes and regulations. The difference between "during" and "before" (or "after") is not just linguistic. It is essential to permit everyone to participate in the markets near the time of a tender offer.... Treating the Williams Act as a mandate for an identical price across the board—as opposed to an identical price for all shares acquired in the offer—would make all investors worse off.

*Id.* at 243 (citations omitted).

The *Lerro* court further rejected the contention that any "extra compensation" in that case was contingent upon a successful tender offer in violation of the All Holders Rule. In so holding, the court noted that "[t]he agreements were signed before the offer began, and were effective with a merger that occurred later ... They are different transactions, under different bodies of law (federal law regulates the tender offer and state law the merger)." *Id.* at 244.

In following the *Lerro* court's reasoning, the District Court for the Northern District of Georgia further noted that it was "logical to import Rule 14d–2's temporal parameters given its stated direct application to 'section 14(d) of the [Williams] Act.'" *Walker*, 145 F.Supp.2d at 1372. Other court decisions further support *Lerro's* and *Walker's* application of Section 14(d)(7) and Rule 14d–10's language that alleged acts must occur during the tender offer period. *See e.g., Kramer*, 937 F.2d at 778–779 (rejecting as "meritless" the argument that extra compensation acquired through a merger after the tender offer expired was actionable under the Williams Act because mergers are distinct from tender offers); *Priddy*, 679 F.Supp. at 1432 (granting summary judgment to the defendants because the alleged "settlement" with a group attempting a hostile takeover of the target company was made prior to the commencement of the tender offer).

Conversely, the plaintiffs urge the court to adopt the Ninth Circuit's reasoning in *Epstein v. MCA, Inc.* 50 F.3d 644 (9th Cir.1995). In *Epstein*, the Ninth Circuit reasoned that:

> [u]nder [the tender offeror's argument], even the most blatantly discriminatory tender offer—in which large shareholders were paid twice as much as small shareholders—would fall outside RUle 14d–10's prohibition, so long as the bidder waited a few seconds after it accepted all of the tendered shares before paying the favored shareholders. Rule 14d–10's equality requirements ... cannot be so easily circumvented.

*Id.* at 655. The District Court for the Western District of Pennsylvania has also stated its preference for a non-literal interpretation of Rule 14d–10. *See Millionerrors Inv. Club v. General Electric, Co., PLC*, 2000 WL 1288333, at *5 (W.D.Pa. Feb.8 2000). Specifically, the *Millionerrors* court accepted the Ninth Circuit's argument that "[a]n inquiry more in keeping with the language and purposes of Rule 14d–10 focuses not on when [a share-

holder] was paid, but on whether the [challenged] transaction was an integral part of [the] tender offer." *Id.* at \*4 (quoting *Epstein,* 50 F.3d at 655). It further held that, "a private transaction involving a select shareholder may be deemed integral to a tender offer if it 'was conditioned on the tender offer's success,' notwithstanding that consideration paid on the private transaction falls outside the tender offer period." *Id.* (quoting *Epstein,* 50 F.3d at 656).

After a careful review of the relevant case law and policy issues, the court concludes that *Lerro* and its progeny reach the better reasoned result. *See also* Note, *Employment Agreements and Tender Offers: Reforming the Problematic Treatment of Severance Plans Under Rule 14D–10,* 102 COLUM. L.REV. 774, 789 (2002) (noting that the strained reasoning of *Epstein* may have resulted from the extraordinary facts of that case and should be understood in that context). In reaching this conclusion, the court is particularly guided by the legislative and administrative history of the statute. Specifically, the House Report to the Williams Act explains:

> [p]roposed section 14(d)(7) would provide that where a person making a tender offer increases the consideration offered to shareholders before the expiration of the tender offer, he must pay the increased consideration to those who tendered their securities prior to the increase in the price, whether or not he had taken up any of the securities before the increase in consideration was announced. The purpose of this provision is to assure fair treatment of those persons who tender their shares at the beginning of the tender period, and to assure equality of treatment among all shareholders who tender their shares.

H.R.Rep. No. 90–1711 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2811, 2821. As the

*Walker* court noted, "[t]his passage indicated Congressional intent that § 14(d)(7), as proposed, would apply to transactions confined within the tender period. It also specifically addresses increases in the tender price 'before the expiration of the tender period,' referencing a temporal frame defined by the tender offer period." *Walker,* 145 F.Supp.2d at 1376.

The Security and Exchange Commission's interpretation of Rule 14d–10 also strongly supports an interpretation favoring temporal limits. In a 1985 release, the SEC stated:

> Best Price Rule.... The date for making the initial determination as to substantial equivalence in value is the earlier of the date of public announcement as specified in Rule 14d–2(b), or the date of commencement as defined in Rule 14d–2(a).... By requiring that a bidder pay the highest consideration offered, this rule would have the effect of codifying the Commission's position that a bidder may not lower the offering price without commencing a new tender offer.

SEC Release Nos. 33–6596; 43–22198, 50 Fed. Ref. 27976, 27978–79 (July 9, 1985); *see also Walker,* 145 F.Supp.2d at 1376.

Thus, in light of the plain meaning of Section 14(d)(7) and Rule 14d–10(a), and the aforementioned legislative and administrative history, the court holds that only variations in price made during the tender offer are actionable under the Williams Act. Applying this holding to the facts of the present case, it is clear that the plaintiffs have failed to allege that the purported "additional compensation" was given to Digital Island's officers and directors during the pendency of the tender offer. Indeed, the plaintiffs rely only upon Schedule 14D–9, which itself demonstrates that Cable & Wireless' agreements with the officers were made prior to May 21. As there can be no Williams Act violation

under these facts, Claim II must be dismissed.

## C. Section 14(a) of the Williams Act

■ In Claim III of the complaint, the plaintiffs allege that all the defendants, except the original directors, failed to disclose material information during the solicitation of proxies in violation of Section 14(a) of the Williams Act, 15 U.S.C. § 78n(a). The defendants contend that this claim must fail for the following three reasons: (1) there is a lack of causation; (2) there was no duty to disclose and (3) the claim does not satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b).

To prevail on a claim under Section 14(a), the plaintiffs must demonstrate, among other things, "that the proxy solicitation itself . . . was 'an essential link in the accomplishment of the transaction.'" *General Electric Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir.1992) (quoting *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)). The Supreme Court has also held that no private right of action under Section 14(a) exists where the minority shareholders lack the necessary power to block a merger. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1101–1103, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). The Court concluded that the plaintiffs could not therefore establish causation for any alleged misstatements in the Proxy Statement. *See id.*

Following *Virginia Bankshares*, both the Third Circuit and at least one District Court in this Circuit have cited that decision for the proposition that there is no causation under Section 14(a) when the plaintiffs' votes are not necessary for the merger's success. *See Scattergood v. Perelman*, 945 F.2d 618, 624–625 (3d Cir. 1991); *Booth v. Connelly Containers, Inc.*, 1991 WL 171450, at *8 (E.D.Pa. Aug.30,

1991). This is precisely the situation with which the plaintiff shareholders in the present case were presented. Specifically, by the time the Proxy Statement was filed on August 3, 2001, Dali had acquired approximately 80% of the outstanding shares in Digital Island. Under Delaware law, a simple majority vote was all that was necessary to approve the merger. *See* DEL. CODE ANN. TIT. 8, § 251(c). As a result, no affirmative votes were required from any other Digital Island shareholders in order to approve the merger. Indeed, this fact was clearly and repeatedly noted in the Proxy Statement. *See* Proxy Statement at Section iv, ¶¶ 2 and 6.

In response, the plaintiffs argue that the allegedly misleading statements in the Proxy Statement deprived them of the opportunity to seek state appraisal remedies, thus satisfying Section 14(a)'s causation requirement. In furtherance of this contention, the plaintiffs cite to two Court of Appeals cases, *Wilson v. Great Am. Indus., Inc.*, and *Howing Co. v. Nationwide Corp.* 979 F.2d 924, 931 (2d Cir.1992); 972 F.2d 700, 709 (6th Cir.1992). The court concludes, however, that those cases are distinguishable from the present facts.

In *Wilson*, the Second Circuit held that the plaintiffs had a cause of action under Section 14(a) arising from a defective Proxy Statement, notwithstanding that they lacked the votes to block the merger, because they were deprived of their rights to an appraisal proceeding. *See Wilson*, 979 F.2d at 931. Ostensibly informing the court's decision in that case, however, was the fact that an appraisal proceeding is the exclusive remedy under New York law. *See e.g., Grace v. Rosenstock*, 23 F.Supp.2d 326, 333 (E.D.N.Y.1998); *aff'd* 228 F.3d 40 (2d Cir.2000). The shareholders in that case were, therefore, deprived of the opportunity to exercise their only right to

seek alternative compensation because of the alleged fraud.

By contrast, an appraisal is not the exclusive remedy for purportedly defrauded shareholders under Delaware law. *See e.g., Turner v. Bernstein,* 776 A.2d 530, 546 (Del.Ch.2000). Delaware law enables plaintiffs alleging disclosure violations to accept the transactional consideration (in lieu of exercising appraisal rights) and to file an equitable action. *See id.* at 548–549. In fact, appraisal is a rarely-invoked remedy in Delaware.[7] *See* Randall S. Thomas, *Revising the Delaware Appraisal Statute,* 3 DEL. L.REV. 1, 22–23 (2000) (observing that, in Delaware, "relatively few appraisal cases are filed" and suggesting that "shareholders view appraisal as an ineffective remedy and prefer to file breach-of-fiduciary duty actions when they believe that they have been treated unfairly"). Notably, some of the plaintiffs in the present case failed to tender their shares and were automatically "cashed out" instead during the merger. None of the plaintiffs—or any other shareholders—initiated an appraisal action. Thus, the plaintiffs' contention that they have lost state remedies rings hollow. *See e.g., Boone v. Carlsbad Bancorporation Inc.,* 972 F.2d 1545, 1559 (10th Cir.1992) (finding no Section 14(a) claim where the plaintiffs did not pursue the alleged lost state remedy). Indeed, the plaintiffs are currently pursuing state claims by prosecuting three class actions in the Delaware Court of Chancery.

Finally, the plaintiffs' theory that they would have pursued appraisal under state law if certain relevant information had been disclosed in the Proxy Statement is unavailing. In *Virginia Bankshares,* the Court noted that policy considerations should determine when a Section 14(a) cause of action will lie. 501 U.S. at 1104–1105, 111 S.Ct. 2749. The Court further warned against sanctioning "speculative claims." *Id.* at 1105, 111 S.Ct. 2749. In the present case, the plaintiffs' theory is wholly speculative and cannot, therefore, protect their Section 14(a) claim from dismissal. *See also Boone,* 972 F.2d at 1559; *Grace,* 23 F.Supp.2d at 334 (holding that "to establish causation . . . plaintiffs must do more than simply assert that they would have sought [appraisal] under state law if certain relevant information had been disclosed.").

Clearly, the Proxy Statement was not an "essential link" in effectuating the merger, and the plaintiffs' Section 14(a) must fail as a matter of law. Because Claim III fails for this reason, the court need not address the defendants' remaining contentions with regard to this Claim, namely that the defendants had no duty to disclose and that the Claim does not satisfy the heightened pleading requirements of the PSLRA and Rule 9(b).

**D. Section 20(a) of the Exchange Act**

■ Claim IV of the complaint alleges a violation of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), against the individual defendants. In order to maintain a cause of action for control person liability under Section 20(a), the plaintiffs must establish: (1) an underlying violation by a controlling person or entity; (2) that the defendants are "controlling persons;" and (3) that the defendants were in some meaningful sense culpable participants in the fraud. *See In re Party City Securities Litig.,* 147 F. Sup.2d 282, 317 (D.N.J.2001). In considering a

---

**7.** It is for this reason that the Sixth Circuit's decision in *Howing* is also distinguishable. There, a divided panel held that a cause of action can be based upon a loss of appraisal rights where the pursuit of such a remedy by the shareholders can be presumed to have been "likely." 972 F.2d at 707–709.

Rule 12(b)(6) motion to dismiss, the plaintiffs' legal conclusions that the individual defendants qualify as "controlling persons" under Section 20(a) may not be accepted as true absent factual support. *See Martin v. EVP Second Corp.*, 1991 WL 131176, at *3 (S.D.N.Y. July 9, 1991). Thus, the heightened standard of the PSLRA requires that a claim under Section 20(a) state with particularity the circumstances of both the defendants' control of the primary violator, as well as of the defendants' culpability as controlling persons. *See e.g., In re Splash Tech. Holdings, Inc. Securities Litig.*, 2000 WL 1727377, at *25 (N.D.Cal. Sept.29, 2000) (recognizing that the PSLRA requires that the plaintiffs "plead the circumstances of the control relationship with particularity").

As an initial matter, the court notes that, to state a claim under Section 20(a), the plaintiff must first set forth "proof of a separate underlying violation of the Exchange Act." *Advanta*, 180 F.3d at 541. Because the court has determined that Claims I, II, and III fail, the Section 20(a) claim must be dismissed as well. *See id; see also VT Investors v. R & D Funding Corp.*, 733 F.Supp. 823, 841 (D.N.J.1990).

However, even assuming that the plaintiffs have stated predicate violations of the securities laws, Claim IV's allegations nevertheless fail to state a claim. In the complaint, the plaintiffs set forth two charges to support their allegations of control person liability under Section 20(a). First, they allege that the individual defendants had sufficient management responsibilities to be "controlling" persons. *See* Complaint at ¶¶ 27, 28, 73. Second, they

again invoke the "group pleading" doctrine to allege that the director defendants "had direct and supervisory involvement in the day-to-day operations of Digital Island or C & W, and therefore, [are] presumed to have had the power to control or influence the particular transactions giving rise to the securities violations herein."[8] Complaint at ¶ 74.

"In order to establish controlling person liability under [Section 20(a) ], a defendant must possess 'actual control over the transactions in question.'" *Antinoph v. Laverell Reynolds Securities, Inc.*, 1989 WL 102585, at *5 (E.D.Pa. Sept.5, 1989) (citation omitted), *aff'd mem.*, 911 F.2d 719 (3d Cir.1990). Furthermore, it is well-settled that "[t]he mere fact that an individual is a director of a firm is not sufficient to show he is a control[ling] person of the firm." *In re Splash Tech. Holdings Securities Litig.*, 2000 WL 1727377, at *16. In the present case, the court concludes that the plaintiffs unsupported allegations regarding management responsibilities fail to allege with the requisite specificity that the individual defendants played a role in the alleged nondisclosures.

Indeed, other than former CEO Ernst, none of the individual defendants are identified as having any responsibilities within Digital Island, other than serving as directors.[9] Instead, the complaint essentially charges that the individual defendants must have known about the alleged misstatements and omissions because they had access to the statements by virtue of their positions as directors. Such allegations alone clearly cannot support a finding of control under Section 20(a).

---

8. To the extent the plaintiffs rely on the group pleading doctrine, the court has already determined that this doctrine did not survive the enactment of the PSLRA. Accordingly, such group allegations are insufficient to state a claim as a matter of law.

9. Notably, even a CEO is not automatically a "controlling person" under Section 20(a). *See e.g., Paracor Fin. Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir.1996) (concluding that the plaintiff must allege that the CEO exercised direct or indirect control over the transaction in question.).

Furthermore, the District Court for the Northern District of California has persuasively held that allegations similar to those in the present case failed to meet the PSLRA's standard for particularity. *See In re Splash Tech. Holdings, Inc. Securities Litig.*, 2000 WL 1727377 (N.D.Cal. Sept.29, 2000). In that case, the court found that a director's "access to unspecified inside information and his purported ability to prevent the issuance of the alleged false reports in this case suggest the possibility of control." *See id.* at *16. The court continued, however, that "these general allegations do not constitute particular evidence of control," reasoning that:

> [f]or example, plaintiffs do not allege that × individual in Splash provided Berger y press release on z date with the request that Berger determine whether the disclosure was sufficient. Likewise, the complaint does not allege that Berger contacted × individual in Splash on y day, told him to pursue z policy, and Splash then pursued that policy. Rather, the complaint attempts to adduce circumstantial evidence of control, relying on a series of favorable inferences from this Court. Plaintiffs have failed to allege control with particularity as to [Berger].

*Id.* Moreover, the defendant-director in *Splash Technology Holdings* had actually signed the allegedly misleading statement. Yet, while noting that the plaintiffs' allegations might have sufficed under "normal pleading standards," the court ultimately concluded that the allegations did not meet the heightened requirements of particularity as required by the PSLRA. *See id.* Mere access to information cannot then sustain an allegation of a Section 20(a) violation. *See e.g., Copland v. Grumet,* 1998 WL 256654, at *15 (D.N.J. Jan.9, 1998) (holding that the unsupported allegation that the defendant controlled the dissemination of information failed to state control with particularity).

Although the plaintiffs do not rely on this case, the court is mindful that at least one District Court has found allegations that the defendant directors "participated in the drafting, preparation, and/or approval" of the alleged misleading statements sufficient to state a Section 20(a) claim. *See Sheehan v. Little Switzerland, Inc.,* 136 F.Supp.2d 301, 308–309, 314–315 (D.Del.2001). However, the plaintiffs here do not allege facts even arguably similar to those in *Sheehan.* Indeed, the complaint merely states that, due to their Board or managerial positions, the defendants actively participated in the alleged fraud and that the defendants knew of the allegedly undisclosed facts. In light of these conclusory allegations, the court finds that the plaintiffs have failed to adequately plead the control prong of a Section 20(a) claim.

Moreover, even had the plaintiffs adequately pled control, they have failed to allege that the individual defendants engaged in "culpable conduct" within the meaning of Section 20(a). As the court noted above, one element of any case imposing liability under Section 20(a) is culpable participation in the securities violation. *In re Party City Securities Litig.,* 147 F.Supp.2d at 317. Even before the heightened pleading standard of the PSLRA took effect, "the Third Circuit clearly indicated that secondary liability under § 20(a) is limited to those persons culpably participating in the wrongful conduct. Here, plaintiffs allege only knowledge of the wrongful conduct ... and fail to allege any knowing and substantial participation in the wrongdoing." *VT Investors,* 733 F.Supp. at 841; *see also Brug v. Enstar Group, Inc.,* 755 F.Supp. 1247, 1256 (D.Del.1991) (dismissing Section 20(a) claims where the plaintiff failed to allege culpable participation beyond the fact that "the corporate position held by each [defendant] ... provided them with the op-

portunity to participate in any fraudulent activities.")

The complaint in the present case is devoid of any allegations sufficient to meet the plaintiffs' heavy burden of demonstrating culpability. Indeed, the complaint broadly and vaguely alleges that the individual defendants "participated" in the purported omissions, but is utterly lacking in any details as to when or how this occurred. *See* Complaint at ¶¶ 60, 73–75. At best, the complaint alleges a factual predicate for the individual defendants' knowledge of the purported misstatements. Such allegations alone are insufficient to establish Section 20(a) culpability.

In addition, the plaintiffs cannot establish culpability by speculating that compensation promised, and provided, to a few Digital Island officers somehow induced the directors to deceive the shareholders. Such allegations of financial motive standing alone cannot support a claim that the directors engaged in culpable conduct. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 772, n. 23 (S.D.N.Y.2001) (stating that the plaintiffs "have failed to cite a single case where the culpable participation prong has been satisfied solely based on allegations of the controlling person's financial motive.")

In sum, the court concludes that the complaint "does nothing more than restate the legal standard for control person liability; it does not provide adequate facts to support these allegations." *Copland v. Grumet*, 1998 WL, 256654, at *15 (D.N.J. Jan.9, 1998). The Section 20(a) claim will, therefore, be dismissed against each of the director defendants.

## V. CONCLUSION

Because the plaintiffs have failed to state a claim upon which relief can be granted as to any of their four claims, the court is constrained to dismiss the Consolidated Amended Class Action Complaint in its entirety. The court will issue an order in conjunction with this opinion.